**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| SCHOENECKERS, INC., d/b/a BI WORLDWIDE, <br><br> Plaintiff, <br><br> v. <br><br> ITA GROUP, INC. and HTK LTD., <br><br> Defendants. | Case No. 4:25-cv-00002-HCA <br><br> **RESISTANCE TO MOTION TO COMPEL SUPPLEMENTAL RESPONSES TO BI WORLDWIDE'S INTERROGATORY NOS. 12–14** |

**DEFENDANTS ITA GROUP, INC. AND HTK LTD.'S RESISTANCE TO THE MOTION
TO COMPEL SUPPLEMENTAL RESPONSES TO INTERROGATORY NOS. 12–14**

**TABLE OF CONTENTS**

INTRODUCTION and RELEVANT BACKGROUND ..................................................... 1

LEGAL STANDARDS ................................................................................................. 2

ARGUMENT.................................................................................................................. 3

I.   The Court Should Sustain ITA Group and HTK's Objections to Interrogatory No. 12 Because It Includes Several Discrete Questions that Count as Separate Interrogatories, It is a Premature Contention Interrogatory, and It Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits.................................................. 3

    A.   Interrogatory 12 Includes Several Discrete Questions that Must Count as Separate Interrogatories.................................................................................. 4

        1.   Interrogatory No. 12 Asks Four Independent Questions, Not One Question with Genuine Subparts ........................................................ 5

        2.   Interrogatory No. 12's "Separately and for Each Accused Product" Instruction Compounds the Multiple-Discrete-Subparts Problem..... 7

    B.   Interrogatory No. 12 is a Premature Contention Interrogatory ...................... 9

    C.   Interrogatory No. 12 Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits..................................................................................... 11

II.  The Court Should Sustain ITA Group and HTK's Objections to Interrogatory No. 13 Because It Includes Several Discrete Questions that Count as Separate Interrogatories, and It Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits..................................................................................................................... 13

    A.   Interrogatory No. 13 Includes Several Discrete Questions that Count as Separate Interrogatories.................................................................................. 14

    B.   Interrogatory No. 13 Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits.................................................................................. 14

III. The Court Should Sustain ITA Group and HTK's Objections to Interrogatory No. 14 Because It is Premature, and It Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits ....................................................................................... 17

    A.   Interrogatory No. 14 is Premature.................................................................. 18

    B.   Interrogatory No. 14 Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits.................................................................................. 19

CONCLUSION............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*ABT Sys., LLC v. Research Prods. Corp.*,
  2017 WL 2573048 (M.D. Pa. June 14, 2017) .......................................................................... 16

*Amgen Inc. v. Sandoz Inc.*,
  2016 WL 1039029 (N.D. Cal. Mar. 15, 2016) .......................................................................... 10

*Apple Inc. v. Samsung Elecs. Co.*,
  2013 WL 156253 (N.D. Cal. Apr. 12, 2013) ............................................................................ 16

*B. Braun Med. Inc. v. Abbott Labs.*,
  155 F.R.D. 525 (E.D. Pa. 1994) ............................................................................................... 10

*Bonutti Skeletal Innovations LLC v. Linvatec Corp.*,
  2014 WL 186123 (M.D. Fl. Jan. 16, 2014) .............................................................................. 11

*CellCast Techs., LLC v. United States*,
  152 Fed. Cl. 414 (2021) ............................................................................................... 11, 12, 18

*Galm v. Eaton Corp.*,
  360 F. Supp. 2d 978 (N.D. 2005) ............................................................................................. 18

*Gott v. United Parcel Service, Inc.*,
  2025 WL 4090516 (S.D. Iowa Nov. 14, 2025) .......................................................................... 2

*IBM Corp. v. The Priceline Grp., Inc.*,
  2016 WL 6305981 (D. Del. Sept. 29, 2016) ............................................................................ 16

*J.S.X. v. Foxhoven*,
  2019 WL 13167114 (S.D. Iowa Jan. 9, 2019) .............................................................. 3, 10, 12

*Kendall v. GES Exposition Servs., Inc.*,
  174 F.R.D. 684 (D. Nev. 1997) .................................................................................................. 4

*Keranos, LLC v. Silicon Storage Technology, Inc.*,
  2013 WL 5763738 (E.D. Tex. Aug. 5, 2013) ............................................................................. 8

*Lyft, Inc. v. Quartz Auto Techs. LLC*,
  2022 WL 17076703 (N.D. Cal. Nov. 18, 2022) .................................................................. 15, 16

*Precision of New Hampton, Inc. v. TriComponent Prods. Corp.*,
    2012 WL 6520139 (N.D. Iowa Dec. 13, 2012) ............................................................. 4, 5, 7, 14

*Sprint Commc'ns Co. L.P. v. Crow Creek Sioux Tribal Court*,
    316 F.R.D. 254 (D.S.D. 2016) .............................................................................................. 3

*Stecklein & Rapp Chartered v. Experian Information Sols., Inc.*,
    113 F.4th 858 (8th Cir. 2024) ......................................................................................... 2, 12

*Strobl v. Werner Ents., Inc.*,
    577 F. Supp. 3d 960 (S.D. Iowa 2022) ............................................................................... 18

*Synopsys, Inc. v. ATopTech, Inc.*,
    319 F.R.D. 293 (N.D. Cal. 2016) ................................................................................. 7, 8, 9, 14

*Trevino v. ACB American, Inc.*,
    232 F.R.D. 612 (N.D. Cal. 2006) ......................................................................................... 4

*Vallejo v. Amgen, Inc.*,
    903 F.3d 733 (8th Cir. 2018) ............................................................................................. 13

*Zubrod v. Hoch*,
    2016 WL 1752770 (N.D. Iowa May 2, 2016) ............................................................. 3, 10, 11

**Rules**

Fed. R. Civ. P. 26(b)(1) .......................................................... 1, 2, 3, 11, 12, 13, 14, 17, 19

Fed. R. Civ. P. 33 ................................................................................... 1, 2, 4, 5, 9, 14

Fed. R. Civ. P. 33(a)(1) ...................................................................................................... 4

Fed. R. Civ. P. 33(a)(2) ................................................................................................. 3, 10

Fed. R. Civ. P. 33(d) ........................................................................................................ 15

Fed. R. Civ. P. 37(a)(3)(B)(iii) .......................................................................................... 2

**INTRODUCTION and RELEVANT BACKGROUND**

BI Worldwide's motion to compel asks the Court to require full answers to Interrogatory Nos. 12, 13, and 14, which taken together, illustrate why Rule 26(b)(1) and Rule 33 impose the limits they do. *See* ECF Nos. 159 & 159-3. Each interrogatory shares a common defect: it demands far more than the Rules allow, whether measured in the number of discrete questions packed into a single interrogatory number, the volume of irrelevant information swept within its scope, or the low probative value of the information compared to the needs of the case.

By its own numbering, BI Worldwide has served fifteen interrogatories on ITA Group and eleven interrogatories on HTK. *See* Exhs. 1–3 (First, Second, and Third Sets of Interrogatories); ECF No. 159-10 (Fourth Set of Interrogatories). As discussed in detail below, ITA Group and HTK contend that Interrogatory Nos. 12 and 13 count for much more than just one interrogatory each. But in any case, ITA Group and HTK objected to providing answers to Interrogatory Nos. 12, 13, and 14 on several grounds, including numerosity, prematurity, relevance, and proportionality. *See* ECF No. 159-15. As BI Worldwide stated in its own brief, the parties met and conferred about these interrogatories and the corresponding objections. However, they were ultimately unable to resolve their differences. ITA Group and HTK were willing to provide appropriately limited answers to Interrogatory Nos. 12 and 13 subject to the parties reaching an agreement on how to count those interrogatories—because the numerosity issues were critical to defining the volume of additional discovery that ITA Group and HTK would have to respond to going forward. Exh. 4. ITA Group and HTK stood by their objections to Interrogatory No. 14. *Id*.

Now, BI Worldwide moves to compel "full supplemental responses" to Interrogatory Nos. 12, 13, and 14. *See* ECF Nos. 159 & 159-3.[1] In its brief, BI Worldwide stated it "clarified several misunderstandings" about the scope of these interrogatories, but its stated clarifications are not clarifications—they materially change the interrogatories. Regardless, the motion seeks "full" responses to the interrogatories as written. *See id*. And for the reasons discussed below, the motion should be denied.

## LEGAL STANDARDS

Under Rule 37(a)(3)(B)(iii), "[a] party . . . may move for an order compelling an answer" to an interrogatory served under Rule 33. *See* Fed. R. Civ. P. 37(a)(3)(B)(iii). Rule 33, in turn, allows a party to serve interrogatories seeking information within the scope of Rule 26(b)(1), which includes "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *See* Fed. R. Civ. P. 26(b)(1), 33.

Information is relevant under Rule 26(b)(1) if it is "probative of the 'claim or defense' that a party is trying to establish, or at least aimed at the discovery of evidence that could be." *Stecklein & Rapp Chartered v. Experian Information Sols., Inc.*, 113 F.4th 858, 861 (8th Cir. 2024) (quoting Fed. R. Civ. P. 26(b)(1)). And whether information is proportional to the needs of the case is determined by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 26(b)(1).

---

[1] BI Worldwide's motion, ECF No. 159, does not state the specific relief the motion seeks. However, the proposed order attached to its motion, ECF No. 159-3, states "Defendants must provide full supplemental responses" to Interrogatory Nos. 12, 13, and 14.

In addition to Rule 26(b)(1)'s relevance and proportionality limitations, district courts "may limit discoverable evidence if the requested information is privileged, unreasonably cumulative, or cheaper or easier to obtain from some other source." *Gott v. United Parcel Service, Inc.*, 3:24-cv-00052-SHL-HCA, 2025 WL 4090516, at *1 (S.D. Iowa Nov. 14, 2025).

Finally, there are particular standards that apply to contention interrogatories. "A contention interrogatory asks another party to indicate what it contends, to state all the facts on which it bases its contentions, to state all the evidence on which it bases its contentions, or to explain how the law applies to the facts." *J.S.X. v. Foxhoven*, 4:17-cv-00417-SMR-HCA, 2019 WL 13167114, at *4 (S.D. Iowa Jan. 9, 2019) (quoting *Sprint Commc'ns Co. L.P. v. Crow Creek Sioux Tribal Court*, 316 F.R.D. 254, 272 (D.S.D. 2016)). They are appropriately used to "help narrow and define issues for trial." *Id*. However, there are two common limitations on their use. *See id*. "First, when contention interrogatories are served early in litigation, courts frequently do not require answers until discovery is completed or the pretrial conference occurs." *See id*.; *Zubrod v. Hoch*, No. C15-2065, 2016 WL 1752770, at *7 (N.D. Iowa May 2, 2016) ("[D]elaying the answer of contention interrogatories until the completion or near completion of discovery is contemplated by Fed. R. Civ. P. 33(a)(2)."). "Second, courts have found that interrogatories which require the responding party to give a narrative account of its case are overly burdensome and do not require a response." *Foxhoven*, 2019 WL 13167114, at *4.

Ultimately, the party objecting to an interrogatory has the burden of showing its objections have merit. *See id*. at *3.

3

**ARGUMENT**

I.    **The Court Should Sustain ITA Group and HTK's Objections to Interrogatory No. 12 Because It Includes Several Discrete Questions that Count as Separate Interrogatories, It is a Premature Contention Interrogatory, and It Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits**

Interrogatory No. 12 begins as a single interrogatory that then evolves into a long list of demands for information that amount to several discrete and separate interrogatories that must count as more than one. It is also a premature contention interrogatory, and it exceeds Rule 26(b)(1)'s relevance and proportionality limits.

A.    **Interrogatory 12 Includes Several Discrete Questions that Must Count as Separate Interrogatories**

Rule 33 allows a party to serve "no more than 25 written interrogatories, *including all discrete subparts*." Fed. R. Civ. P. 33(a)(1) (emphasis added). "Although the term 'discrete subparts' does not have a precise meaning, courts generally agree that 'interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question.'" *Precision of New Hampton, Inc. v. TriComponent Prods. Corp.*, No. CV12–2020, 2012 WL 6520139, at *2 (N.D. Iowa Dec. 13, 2012) (quoting *Trevino v. ACB American, Inc.*, 232 F.R.D. 612, 614 (N.D. Cal. 2006)). The touchstone is independence: if a subsequent question "can stand alone" and is not truly "secondary" to the first, it should be counted as its own interrogatory—even when the drafter has joined related questions "by a conjunctive word" or packaged them under a single number. *Id.* (quoting *Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 685–686 (D. Nev. 1997)).

Interrogatory No. 12 asks one primary question followed by one genuine subpart and three discrete subparts that are independent questions for a total of four independent questions. It then

4

compounds the numerosity problem by asking these independent questions "[s]eparately for each Accused Product." ECF No. 159-10, Exh. G, at 2–3. In full, Interrogatory No. 12 reads:

> Separately for each Accused Product, describe in detail Your contention regarding the path user-related data takes through the Accused Product. A complete answer will describe how each Accused Product ingests user-related data and other engagement metrics concerning users' website behavior, engagement, navigation, clickstream, loyalty activity, and/or system usage; how the user-related data and engagement metrics are converted into or generates user-related incentive program information concerning user eligibility, user entitlement, incentive accrual, incentive redemption, user recognition, user benefits, client loyalty data, incentive rewards, or incentive offers; and how such user-related incentive program information is delivered to, displayed on, or otherwise made available or presented through client-affiliated websites. In Your description, specify each action, activity, or condition that initiates the flow of user-related data through the Accused Products.

ECF No. 159-10, Exh. G, at 2–3.

### 1.    Interrogatory No. 12 Asks Four Independent Questions, Not One Question with Genuine Subparts

Parsed correctly, Interrogatory No. 12 does not ask a single question with secondary questions that are subsumed and necessarily related. Instead, it begins with a primary question about "the path user-related data takes through the Accused Product" and then proceeds to demand answers to four separate questions, each of which could be posed in isolation, answered in isolation, and litigated in isolation:

> *First*, how does each Accused Product *ingest* user-related data and engagement metrics like website behavior, navigation, clickstream, loyalty activity, and system usage?
>
> *Second*, how is that data *converted* into incentive program information like eligibility, entitlement, accrual, redemption, recognition, benefits, and offers?
>
> *Third*, how is that incentive program information *delivered* and *displayed* on client-affiliated websites?
> *Fourth*, what actions, activities, or conditions *initiate* the flow of data through the Accused Products in the first place?

*See* ECF No. 159-15, Exh. L, at 1–4.

5

Applying Rule 33's inquiry, the first subpart about how user-related data is ingested appears to be a genuine subpart of the primary question about the path of user-related data. *See Precision*, 2012 WL 6520139, at *2. The remaining three subparts, however, are independent questions that stand alone. Interrogatory No. 12's primary question asks for a "contention regarding the path *user-related data* takes through the Accused Product." *Id*. at 1. That framing specifically focuses on a single, unified inquiry into one thing: the trajectory of "user-related data." *See id*. The first subpart about how user-related data is ingested maintains that framing. But the next three subparts do not. The second subpart is not about user-related data but about how that data is "converted into or generates" an entirely different category of information—i.e., "incentive program information." *Id*. The third subpart shifts focus even further. It is not about user-related data at all but about how "incentive program information" is "delivered to, displayed on, or otherwise made available" to end users. And finally, the fourth subpart moves away from the user-related data path altogether by asking about the antecedent "action[s], activit[ies], or condition[s]" that trigger the process in the first place, which is not about data flow.

Ultimately, all four subparts are each questions about distinct technical functions: data *ingestion* is a question about inputs; data *conversion* is a question about backend processing logic; data *delivery* and *display* is a question about front-end presentation; and the *triggering conditions* for the entire data flow are a question about system architecture that logically precedes ingestion altogether—they stand prior to and independent of all three. The first subpart is secondary to the primary question about the path of user-related data, but the remaining subparts stand alone as independent questions about functionally and technically distinct subjects.

BI Worldwide did not meaningfully address this aspect of ITA Group and HTK's objection in its motion brief. ECF No. 159-1, at 14–17. It summarily argued that Interrogatory No. 12's

subparts comprise one interrogatory because they are logically or factually related without addressing the significant technical and substantive differences between: (1) the ingestion of user data, (2) the conversion of user data to incentive program information, (3) the delivery or display of incentive program information, and (4) the triggering conditions for the user data flow. *See id*. In passing, BI Worldwide stated the various subparts represent the flow of data through the alleged infringing platforms. However, the mere fact that ingestion, conversion, and delivery describe sequential stages of the same overall system does not make them "logically or factually subsumed within and necessarily related to the primary question." *Precision*, 2012 WL 6520139, at *2. For example, asking a manufacturer to separately describe its raw-material sourcing, its assembly line process, and its retail packaging would not constitute a single question simply because all three things occur along the same commercial pathway. Similarly, Interrogatory No. 12's subparts are not logically and factually subsumed simply because they are sequential steps of a system.

BI Worldwide also stated that the various subparts were ultimately intended to "guide" ITA Group and HTK's description of the flow of user-related data through the alleged infringing software platforms. *See id*. But whether they are characterized as guidance or not, Interrogatory No. 12's subparts still ask independent questions about technically distinct functions, and BI Worldwide never attempted to explain how "they are logically or factually subsumed within and necessarily related to the primary question." *Precision*, 2012 WL 6520139, at *2.

### 2. Interrogatory No. 12's "Separately and for Each Accused Product" Instruction Compounds the Multiple-Discrete-Subparts Problem

Interrogatory No. 12 compounds its numerosity problem by requesting answers to its four questions "[s]eparately and for each accused product," of which there are three.

As illustrated by the last argument, "the task of counting interrogatories requires a case-specific assessment." *Synopsys, Inc. v. ATopTech, Inc.*, 319 F.R.D. 293, 295 (N.D. Cal. 2016). But

there are some "recurring issues in patent cases" that "have resulted in helpful principles," one of which is that "[w]here a case involves multiple accused products, courts generally have concluded that a single interrogatory seeking information about all accused products contains at least as many discrete subparts as there are accused products at issue, and potentially more depending on what information is sought about each accused product." *Id*. at 295–297. So generally, courts "look to the number of distinct accused products as a basis for counting interrogatories." *See id*. at 296.

The exception to this general principle is when the asserted patents cover similar technology and the accused products are all substantially similar and infringe in substantially the same way. *See Synopsys, Inc. v. ATopTech, Inc.*, 319 F.R.D. at 296. In those circumstances, courts have determined that an interrogatory directed at multiple accused products may count as one interrogatory. *See id*. For example, in *Synopsys*, the court treated one interrogatory directed at several different versions of the same accused product as a single interrogatory because "all versions of the . . . product [were] substantially similar with respect to the accused functionalities and infringe[d] the . . . claims in substantially the same way." *Id*. at 295. Similarly, in *Keranos, LLC v. Silicon Storage Technology, Inc.*—a case cited by BI Worldwide—the court treated one interrogatory directed at multiple accused products as a single interrogatory because the asserted patents "all cover[ed] similar technology" and "the accused products incorporate[ed] similar or in some cases identical technology." Case No. 2:13–cv–17, 2013 WL 5763738, at *2 (E.D. Tex. Aug. 5, 2013). So overall, courts "look to the number of distinct accused products as a basis for counting interrogatories," except when the asserted patents cover similar technology and the accused products are all substantially similar in functionality and infringing characteristics. *See Synopsys*, 319 F.R.D. at 295–297.

Here, Interrogatory No. 12 instructs ITA Group and HTK to answer its four discrete and independent questions "[s]eparately for each Accused Product." ECF No. 159-10, Exh. G, at 2–3. BI Worldwide accuses three different platforms of infringement, and it does not argue that these three platforms are all substantially similar in functionality or infringing characteristics. *See* ECF No. 159-1, at 2, 14–17. BI Worldwide merely described the platforms at the highest possible level—"enterprise-level platform[s] designed to administer incentive . . . programs"—and stated that ITA Group and HTK assert "various noninfringement positions." *See id*. at 2. As a result, the general principle applies: "a single interrogatory seeking information about all accused products contains at least as many discrete subparts as there are accused products at issue, and potentially more depending on what information is sought about each accused product." *See Synopsys*, 319 F.R.D. at 295. And under that principle, Interrogatory No. 12's instruction to answer its four independent questions for each of the three platforms counts as separate interrogatories. *See id*.

BI Worldwide argues ITA Group and HTK's numerosity objections lack merit because not every interrogatory directed at multiple accused products necessarily counts as separate interrogatories. *See* ECF No. 159-1, at 20. This argument overlooks the general principle and relies on the exception without establishing that the exception applies. As discussed above, courts *do* "look to the number of distinct accused products as a basis for counting interrogatories," except when the accused products are all substantially similar in functionality and infringing characteristics. *See Synopsys*, 319 F.R.D. at 295–297. BI Worldwide has not shown that the three platforms involved in this case are substantially similar. In fact, each of them was developed by

different entities and does not function uniformly. *See* ECF No. 159-5, Exh. B, at 2–10; ECF No. 159-6, Exh. C. So the general principle applies, and BI Worldwide's argument neglects it.[2]

In sum, Interrogatory No. 12 consists of four independent questions plus an instruction to answer these questions for each of the three platforms it accuses of infringement. This counts for twelve separate interrogatories under Rule 33.

## B.     Interrogatory No. 12 is a Premature Contention Interrogatory

Interrogatory No. 12 asks ITA Group and HTK to describe their "contention regarding the path user-related data takes through" alleged infringing platforms, making it a contention interrogatory that is premature at this point in the case. ECF No. 159-10, Exh. G, at 2.

"[W]hen contention interrogatories are served early in litigation, courts frequently do not require answers until discovery is completed or the pretrial conference occurs." *See Foxhoven*, 2019 WL 13167114, at *4; *Zubrod*, 2016 WL 1752770, at *7 ("[D]elaying the answer of contention interrogatories until the completion or near completion of discovery is contemplated by Fed. R. Civ. P. 33(a)(2)."). If the party that served a contention interrogatory wants an earlier answer, then that party "bears the burden of proving how an earlier response assists the goals of discovery." *Zubrod*, 2016 WL 1752770, at *7 (quoting *B. Braun Med. Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994)). And "[a] party seeking early answers to contention interrogatories cannot meet its burden of justification by vague or speculative statements about what might happen if the interrogatories were unanswered." *Id.* (quoting *Amgen Inc. v. Sandoz Inc.*, Case No. 14-cv-04741-RS (MEJ), 2016 WL 1039029, at *3 (N.D. Cal. March 15, 2016)). Instead, "the propounding party

---

[2] BI Worldwide also argued that ITA Group and HTK did not previously assert numerosity objections based on the number of accused platforms. Yet, ITA Group's previous objections *do* assert numerosity issues based on the number of accused platforms. *See* ECF No. 159-5, Exh. B, at 3.

must present specific, plausible grounds for believing that securing early answers to its contention questions will materially advance the goals of the Federal Rules of Civil Procedure." *Id.*

Requiring complete answers to Interrogatory No. 12's several discrete questions at this point in the case is premature, particularly before the Court enters a claim construction order. To illustrate, the parties dispute the construction of the term "incentive information." ITA Group and HTK construe that term to mean "data reflecting a reward for viewer activity on a website or network site," and BI Worldwide construes it to mean any "information intended to incentivize viewer activity." ECF No. 113, at 2. Also, two of Interrogatory No. 12's discrete subparts ask about "incentive program information"—i.e., incentive information—specifically how user-related data is converted into incentive information and how incentive information is then delivered or displayed. ECF No. 159-10, Exh. G, at 2. That means the Court's construction of "incentive information" will directly affect the scope of information that is responsive and proportional for purposes of Interrogatory No. 12. The same is true for other disputed claim terms, including "embedded/embedding" and "incentive application." ECF No. 113, at 2. For example, the Patent claims involve "incentive information" being awarded to website users using an "embedded" "incentive application" based on their "activity information." *See, e.g.*, ECF No. 1-2, at 30–31. Not all user-related data or incentive program information—as called for in Interrogatory No. 12— is relevant or proportional in light of these claim terms, especially depending on the Court's construction of these terms. It is therefore premature to require complete answers to Interrogatory No. 12's various discrete parts at least until a reasonable time after the Court enters a claim construction order. *See CellCast Techs., LLC v. United States*, 152 Fed. Cl. 414, 434 n.8 (2021) ("Numerous courts and patent law scholars also recognize barring broad discovery until after claim construction is cost-saving in patent infringement lawsuits."); *Bonutti Skeletal Innovations LLC v.*

11

*Linvatec Corp.*, No. 6:12-CV-1379-ORL-22, 2014 WL 186123, at \*4 (M.D. Fl. Jan. 16, 2014) (concluding the interrogatory at issue was "premature" before the claim construction order).

Other than generically explaining why Interrogatory No. 12 is relevant and why it prefers complete answers, BI Worldwide has not met its burden of proving why complete answers at this point versus after claim construction will materially advance the goals of the Rules of Civil Procedure. *Zubrod*, 2016 WL 1752770, at \*7. As discussed above, there are compelling reasons why complete answers are premature at least until after the Court enters a claim construction order. The Court should therefore sustain ITA Group and HTK's objections to Interrogatory No. 12.

### C.   Interrogatory No. 12 Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits

Relevance and proportionality are the two main limitations on discovery requests, including interrogatories. *See* Fed. R. Civ. P. 26(b)(1), 33. Information is generally relevant if it is "probative of the 'claim or defense' that a party is trying to establish, or at least aimed at the discovery of evidence that could be." *Stecklein*, 113 F.4th at 861 (quoting Fed. R. Civ. P. 26(b)(1)); *Foxhoven*, 2019 WL 13167114, at \*3. And information is proportional to the needs of the case or not depending on several things, including the importance of the discovery in resolving the issues [ ] and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 26(b)(1).

Here, the scope and breadth of Interrogatory No. 12's various questions exceed Rule 26(b)(1)'s relevance and proportionality limits in multiple ways. First, Interrogatory No. 12's primary question and its first subpart ask about the path and ingestion of all "user-related data," which is much broader than the "activity information"[3] covered by the Patent claims and not

---

[3] The parties agreed to the construction of "activity information" as "information about viewer activity on a website or network site." ECF No. 113, at 2.

relevant to the infringement claims. Although BI Worldwide stated Interrogatory No. 12 "concerns" information "relevant to the Asserted Patents' claim limitations," this does not meaningfully clarify its scope—it just acknowledges Rule 26(b)(1)'s already-existing relevance limitation. ECF No. 159-1, at 9. Nor does it address the next point, which is that the Court's construction of several disputed claim terms will determine the scope of information that is relevant and proportional for purposes of Interrogatory No. 12. Requiring complete answers now is therefore not proportional to the needs of the case because it would require ITA Group and HTK to provide answers based on unsettled claim scope and containing information with ultimately little to no probative value to the case. *See CellCast*, 152 Fed. Cl. 414, 434 n.8. Finally, ITA Group and HTK have provided the source code and a great deal of technical documents for the three alleged infringing platforms, all of which include substantial information about how user data travels through the platforms. The source code, in particular, should reveal most of what Interrogatory No. 12's various parts ask for with respect to how data is ingested, how data is processed, where data is stored, and how data moves within the platform, and how results based on the data are delivered or displayed. Yet, Interrogatory No. 12 asks for a written narrative on top of what the source code and other technical documents reveal. This is not proportional to the needs of the case, especially when both the serving and responding party in discovery "have a collective responsibility to consider the proportionality of all discovery." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26(b)(1), advisory committee's notes to 2015 amendment). If there is some element of Interrogatory No. 12 that ITA Group and HTK's source code and other document production leave vague or unanswered, then BI Worldwide should interrogate that. But a substantially overlapping interrogatory exceeds Rule 26(b)(1)'s proportionality limitation.

II.    **The Court Should Sustain ITA Group and HTK's Objections to Interrogatory No. 13 Because It Includes Several Discrete Questions that Count as Separate Interrogatories, and It Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits**

The breadth of Interrogatory No. 13 is vast. It asks ITA Group and HTK to cite the specific lines of source code that match each and every sentence of their answers to three previous interrogatory answers—Interrogatory Nos. 8, 9, and 12—which, in turn, ask about the function and operation of the three alleged infringing platforms, how ITA Group and HTK design and operate *any* software-based incentive program, and how data travels through the platforms. Immediately, the structure of Interrogatory No. 13—incorporating three previous interrogatories— suffers an even worse numerosity problem than Interrogatory No. 12, which itself contains four separate and discrete interrogatories. It also requests a significant amount of irrelevant information and information that is not proportional to the needs of the case.

In full, Interrogatory No. 13 reads:

> Identify by file name and relevant line number the specific source code functions, data structures, and files that embody or facilitate the functionality described in each sentence of Your responses to Interrogatories No. 8, 9, and 12.

ECF No. 159-10, Exh. G, at 3.

A.    **Interrogatory No. 13 Includes Several Discrete Questions that Count as Separate Interrogatories**

To start, Interrogatory No. 13 suffers from the same numerosity problem as Interrogatory No. 12, only compounded even further. It is not only directed at three different accused products, like Interrogatory No. 12, it also asks ITA Group and HTK to perform the same source-code identification exercise three separate times for their respective answers to Interrogatory Nos. 8, 9, and 12. And on top of that, Interrogatory No. 12, itself, contains four discrete parts that all count as separate interrogatories. So at a minimum, Interrogatory No. 13 is directed at three different accused products and incorporates three separate antecedent interrogatories, one of which is itself

four interrogatories on its own. This amounts to at least eighteen discrete and separate questions—six incorporated interrogatories all directed at three different platforms. *Precision*, 2012 WL 6520139, at *2; *Synopsys*, 319 F.R.D. at 295–297. And because Interrogatory No. 12 counts as four interrogatories, *see supra*, Interrogatory Nos. 12 and 13 alone take BI Worldwide well past Rule 33's allotment of twenty-five. *See* Fed. R. Civ. P. 33.

**B.      Interrogatory No. 13 Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits**

Next, Interrogatory No. 13's request for citations to the specific lines of source code that match each and every sentence of ITA Group and HTK's answers to Interrogatory Nos. 8, 9, and 12 is so broad that it indiscriminately requests source code citations for things that are either irrelevant to the claims or defenses in this case or so marginal in probative value that the request is not proportional to the needs of the case. That is, Interrogatory No. 13 is, in some respects, not aimed at information that is relevant and proportional to the needs of the case. Rather, it is indiscriminately aimed at a much broader scope of information—i.e., every sentence of the answers to three previous interrogatories regardless of the substantive value of the sentence. For example, some sentences in the answers to Interrogatory Nos. 8 and 9 generically characterize a platform as a SaaS platform (ECF No. 159-6, at 4) while others discuss password storage (*id*. at 4), generic advice and guidance on APIs (*id*. at 5), management of platform deployments (*id*. at 8), and functions a platform does *not* perform or support (*id*. at 8–9). None of these things have probative value to the case, and it is not proportional to force ITA Group and HTK to attempt to cite all the specific lines of source code that correspond to every sentence.

Interrogatory No. 13's request for citations to all the specific lines of source code that correspond to each and every sentence in answers to Interrogatory Nos. 8, 9, and 12 is also not consistent with precedent. District courts have, as BI Worldwide pointed out, generally recognized

that a producing party is in a better position to understand the functionality of its own software platform and the structure of the associated source code. *See, e.g., Lyft, Inc. v. Quartz Auto Techs. LLC*, Case No. 21-cv-01871-JST (RMI), 2022 WL 17076703, at *4–5 (N.D. Cal. Nov. 18, 2022). And because of that, courts have tended to require producing parties to do more than cite Rule 33(d) and provide a "bald reference to the entire body of [their] source code, without more," in response to interrogatories fairly aimed at the functioning of its platform. *See id*. at 5. Still, many courts do not tend to go so far as to require parties to cite all the specific lines of source code that correspond to every sentence of a written description of a platform's functionality, especially when the party requesting such extensive granularity has not demonstrated a real need for that or why the requesting party lacks the ability to navigate the produced source code itself in order to do its own analysis. *See id*. at *4–5; *IBM Corp. v. The Priceline Grp., Inc.*, Civil Action No. 15–137–LPS, 2016 WL 6305981, at *1 (D. Del. Sept. 29, 2016); *ABT Sys., LLC v. Research Prods. Corp.*, No. 1:14-cv-02007, 2017 WL 2573048, at *2–4 (M.D. Pa. June 14, 2017). Instead, courts generally require a producing party to "provide navigational tools to understand its source code." *ABT Sys.*, 2017 WL 2573048, at *2. They do not, however, require a producing party to "help its adversary prove the adversary's claim or defense" or to help its adversary conduct its own source code analysis. *ABT Sys.*, 2017 WL 2573048, at *2; *Lyft*, 2022 WL 17076703, at *4–5; *Apple Inc. v. Samsung Elecs. Co.*, No. 12-0630, 2013 WL 156253, at *1 (N.D. Cal. Apr. 12, 2013). Once the receiving party has the navigational tools necessary to understand the source code, then absent circumstances proving otherwise, it is in as good a position as the producing party to analyze the code. *See ABT Sys.*, 2017 WL 2573048, at *2; *Lyft*, 2022 WL 17076703, at *4–5; *IBM Corp.*, 2016 WL 6305981, at *1. And it cannot shift the burden of analyzing the code to another party. *See id*.

16

Here, BI Worldwide does not argue that it lacks any parts of the source code for the alleged infringing platforms. Nor does it argue that it lacks the navigational tools or ability to understand the code or its structure. Instead, it argues that ITA Group and HTK should have to analyze and map the source code onto each and every sentence of their answers to Interrogatory Nos. 8, 9, and 12 in granular detail simply because they are the parties that produced the source code. But the fact that they produced the code is not a compelling reason to shift the analytical burden onto ITA Group and HTK. It justifies a request for navigational tools sufficient to understand the code and its structure, but it is not a compelling reason to require ITA Group and HTK to perform the level of granular source code analysis that Interrogatory No. 13 requests, especially when BI Worldwide has not provided a reason why it lacks the ability to do so itself.

Although BI Worldwide asserts that it "clarified . . . Interrogatory No. 13 seeks the principal source code references underlying the material functionality [ITA Group and HTK] contend is reflected in previous interrogatory responses," this does not track with the language of Interrogatory No. 13, which asks for the specific lines of code that correspond to the functionality described in "*each* sentence" of Interrogatory Nos. 8, 9, and 12. ECF No. 159-1, at 3 (emphasis added). And BI Worldwide's motion to compel asks for "full supplemental responses to Interrogatory No. 13." *See* ECF No. 159-3. Nor does it address the numerosity problems with Interrogatory No. 13 or Interrogatory No. 12, which is incorporated into Interrogatory No. 13.

Ultimately, Interrogatory No. 13 suffers a serious numerosity problem. It also requests specific source code citations to platform functionality that lacks probative value to the claims and defenses in this case. And on top of that, it is not proportional to the needs of the case because it goes beyond information necessary for it to perform its own source code analysis and asks ITA Group and HTK to do its source analysis for it.

**III.    The Court Should Sustain ITA Group and HTK's Objections to Interrogatory No. 14 Because It is Premature, and It Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits**

Interrogatory No. 14 asks ITA Group and HTK to identify every customer that has used an "iFrame or any other method of embedding" in connection with any aspect of the alleged infringing platforms. ECF No. 159-10, Exh. G., at 3. This is premature because "embedded/embedding" is a disputed claim term that the parties construe quite differently. ECF No. 113, at 2. It also seeks a great deal of irrelevant information and information that is not proportional.

Interrogatory No. 14 reads:

> Identify whether each Accused Product Customer, past or present, has utilized an "iFrame" or any other method of embedding, connecting, integrating, providing, or displaying data, features, elements, or other information of the Accused Product within the customers' websites, applications, or any other display environments, including but not limited to, the Axis "iFrame" method identified at BATES No. ITA00168616 or the Horizon methods identified at BATES Nos. ITA00014751, ITA00064862, ITA00064874, ITA00064877, ITA00069547, and ITA00104770. For each Accused Product Customer you contend has not used such a method, identify any documents that support Your contention as well as an individual who can describe the Accused Product Customer's system.

ECF No. 159-10, at 3.

**A.    Interrogatory No. 14 is Premature**

District courts have "broad discretion in defining the scope of discovery, settling discovery disputes, and limiting the scope of discovery where appropriate." *Galm v. Eaton Corp.*, 360 F. Supp. 2d 978, 982 (N.D. 2005); *Strobl v. Werner Ents., Inc.*, 577 F. Supp. 3d 960, 965 (S.D. Iowa 2022). And as previously noted, courts and commentators "recognize barring broad discovery until after claim construction is cost-saving in patent infringement lawsuits." *CellCast*, 152 Fed. Cl. at 434 n.8.

Here, Interrogatory No. 14 is premature because it presupposes a construction of "embedded" that has not been adopted. It asks for the identification of customers that use an iFrame

"or any other method of embedding, connecting, integrating, providing, or displaying data, features, elements, or other information" within the customer's website, application, or "any other display environment." That phrasing, including iFrames specifically, does not describe a neutral factual inquiry. It presupposes BI Worldwide's own construction of the disputed claim limitation "embedded"—which is not a modest one—[4]and then goes beyond it. By defining the relevant category to include not just embedding, but also connecting, integrating, providing, and displaying, across not just websites but applications and "any other display environment," BI Worldwide has drafted an interrogatory that reaches every conceivable mechanism by which content from one system might reach or appear alongside another. That is not a description of "embedded" or the technology that is actually covered by the Patent claims involved in this case. It is a description of the entire universe of cross-application content delivery, of which "embedded" is, at most, a narrower subset.

This matters because answering Interrogatory No. 14 now would require ITA Group and HTK to investigate and catalog customer implementations using not only BI Worldwide's maximally broad construction but also mechanisms bearing no relationship to the claimed invention. This is precisely the sequencing problem that claim construction exists to avoid. Discovery should be shaped by the claims as they will ultimately be construed, not by whichever party's proposed construction is inserted into the language of a discovery request. Interrogatory No. 14 is therefore premature and should not be answered until after a claim construction order.

---

[4] BI Worldwide construes "embedded" and "embedding" as "included in one application from another" and any "method of including information from one application in another," respectively, which strips these claim terms of real meaning. ECF No. 113, at 2; ECF No. 124, at 11–17; ECF No. 137, at 4–11.

19

**B.      Interrogatory No. 14 Exceeds Rule 26(b)(1)'s Relevance and Proportionality Limits**

Interrogatory No. 14 also asks for information that is not relevant and not proportional. The claims recite an incentive application embedded in websites. So the object embedded is an incentive application; the method is embedding; and the destination is websites. Yet Interrogatory No. 14 targets the use of an "iFrame or any other method of embedding, connecting, integrating, providing, or displaying data, features, elements, or other information of the Accused Products within [a] customer's websites, applications, or any other display environment." That is, Interrogatory No. 14 asks for information that goes well beyond the scope of the claim limitations and therefore seeks information with little to no probative value to the claims or defenses in this case. Asking about every conceivable method of "connecting, integrating, providing, or displaying" information sweeps in vast amounts of technically irrelevant information. Similarly, "data, features, elements, or other information," is far broader than "incentive application," and "any other display environments" extends well beyond "websites." As a result, Interrogatory No. 14 is not grounded in the relevant claim limitations. It is, instead, a request aimed at the entire universe of cross-application content delivery, which encompasses a great deal of information that is not relevant and not proportional to the needs of the case.

## CONCLUSION

For all these reasons, the Court should sustain ITA Group and HTK's objections to Interrogatory Nos. 12, 13, and 14, and it should deny BI Worldwide's motion to compel, ECF No. 159.

Respectfully submitted,

ITA GROUP, INC. and HTK, LTD.*,* Defendants,

By: */s/Nicholas F. Miller*
Nicholas F. Miller
Brian J. Laurenzo
Allison M. Steuterman
Charles E. Forney
Jack A. Hatanpa
Jacob S. Blackford
**BRICK GENTRY, P.C.**
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 274-1450
Facsimile: (515) 274-1488
Email: nick.miller@brickgentrylaw.com
    brian.laurenzo@brickgentrylaw.com
    allison.steuterman@brickgentrylaw.com
    charles.forney@brickgentrylaw.com
    jack.hatanpa@brickgentrylaw.com
    jacob.blackford@brickgentrylaw.com

## CERTIFICATE OF SERVICE

I certify that on July 31, 2026, a copy of the foregoing pleading was electronically filed with the Clerk of Court. All parties of record registered with the CM/ECF filing system will receive notification of such filing through CM/ECF. Parties of record not registered with the CM/ECF filing system will be provided notification of this filing by U.S. Mail.

By:   */s/ Nicholas F. Miller*
Nicholas F. Miller

21